In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 13-1633, -1640

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHAWN M. SIEGEL,

*Defendant-Appellant.*

_____

Appeals from the United States District Court for the
Central District of Illinois.
Nos. 1:11-CR-10093-MMM, 1:12-CR-10010-MMM — **Michael M. Mihm**,
*Judge.*

_____

No. 13-1767

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HAYWOOD NORFLEET,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Central District of Illinois.

No. 3:12-CR-30099-SEM-BGC — **Sue E. Myerscough**, *Judge.*

————————————

ARGUED APRIL 8, 2014 — DECIDED MAY 29, 2014

————————————

Before POSNER and TINDER, *Circuit Judges* and LAWRENCE, *District Judge.*[*]

POSNER, *Circuit Judge.* We have consolidated these two criminal appeals because (with an exception discussed at the end of the opinion) both challenge only conditions of supervised release, imposed by the district court, and because the challenges raise closely related issues concerning such conditions. The issues ramify far beyond these two cases, however, which exemplify common but largely unresolved problems in the imposition of such conditions as a part of federal criminal sentencing.

Defendant Siegel was convicted of child sexual abuse, and the conditions of supervised release imposed on him—all for the entirety of his life remaining upon completion of his prison sentence—include a ban on the possession of legal or illegal material that "contains nudity" and the use any mood-altering substance, and a requirement that he undergo a sexual-offender treatment program. Defendant Norfleet was convicted of distributing illegal drugs. The conditions of supervised release imposed on him (for an eight-year period commencing with his release from prison) include a ban on the use of mood-altering substances and on excessive use of alcohol, and a requirement that he undergo substance-abuse treatment and cognitive behavioral therapy. These are only a

———————————

[*] Of the Southern District of Indiana, sitting by designation.

few of the discretionary conditions of supervised release imposed on the two defendants.

The Sentencing Reform Act of 1984 replaced parole for federal crimes with supervised release. 18 U.S.C. § 3583. Granted in the discretion of the federal parole board after a convicted defendant began serving his sentence, parole allowed him to be released before the expiration of his prison term, on conditions (coterminous with that term) designed to reduce the likelihood of his committing further crimes. In contrast, supervised release (a form of what is called "community supervision," see, e.g., Leanne Fiftal Alarid, *Community-Based Corrections* (9th ed. 2013); Edward J. Latessa & Paula Smith, *Corrections in the Community* (5th ed. 2011)) entails restrictions imposed at sentencing that don't take effect until the defendant is released from prison. It thus lengthens his sentence, unlike parole. On supervised release generally, see U.S. Sentencing Commission, *Federal Offenders Sentenced to Supervised Release* (July 2010), www.ussc.gov/sites/default/files/pdf/training/annual-national-training-seminar/2012/2_Federal_Offenders_Sentenced_to_Supervised_Release.pdf (visited May 27, 2014, as were the other websites cited in this opinion).

Apart from a handful of conditions required by the Sentencing Reform Act itself, see section 3583(d) and U.S.S.G. § 5D1.3(a), conditions of supervised release are discretionary. Some of the discretionary conditions are designated as "standard," §§ 5D1.3(c); others are called "special conditions" of supervised release, §§ 5D1.3(d)–(e), and are recommended for particular offenses. The list of conditions is not intended to be exhaustive; sentencing judges can impose conditions of their own devising. All discretionary condi-

tions of supervised release must, however, comply with overall federal sentencing policy as stated in 18 U.S.C. § 3553(a), especially subsection (a)(2), which requires the judge to consider "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Conditions of supervised release are of course part of the sentence.

Unfortunately the directives in section 3553(a)(2) are vague and general, and as with so many multifactor standards there is no attempt to give weights to the different factors, though without weighting its factors a multifactor test is not a test but a list, and cannot yield an objective result. A recent article offers some helpful guidance, however. It explains that before imposing conditions of supervised release (other than a handful that must be imposed regardless of the offense, such as not committing another crime after being released from prison), "the judge must find that such a condition: (1) is 'reasonably related' to the background of the offense, the offender, or to one of the purposes of sentencing (other than punishment); (2) involves no greater deprivation of liberty than 'reasonably necessary' for the relevant purposes of sentencing; and (3) is consistent with the policy statements of the Sentencing Commission." Fiona Doherty, "Indeterminate Sentencing Returns: The Invention of Supervised Release," 88 *N.Y.U. L. Rev.* 958, 1012 (2013) (footnotes omitted). Logically, (3) is not applicable to discretionary conditions already listed in the guidelines, such as sub-

stance-abuse treatment; but the decision to impose *any* discretionary conditions must comply with the section 3553(a) sentencing factors. See 18 U.S.C. §§ 3583(c), (d)(1), (d)(2). So although a defendant's presentence report, prepared by the federal probation service, normally recommends particular conditions of supervised release, the judge is not bound by the recommendations and cannot be, because he is required to conform all parts of his sentence to section 3553(a).

As we'll see when we examine the particulars of our two cases, there are serious problems with how some district judges are handling discretionary conditions of supervised release at sentencing. Two of the problems are relatively minor, and we mention them quickly to get them out of the way. One is the number—thirty—and the other the variety of the listed discretionary conditions. See 18 U.S.C. § 3563(b); U.S.S.G. §§ 5B1.3(c)–(e). The sheer number may induce haste in the judge's evaluation of the probation service's recommendations and is doubtless a factor in the frequent failure of judges to apply the sentencing factors in section 3553(a) to all the recommended conditions included in the sentence.

Because conditions of supervised release, though imposed at sentencing, do not become operational until the defendant is released, the judge has to guess what conditions are likely to make sense when the defendant is released. The longer the sentence, the less likely the guess is to prove accurate. Conditions that may seem sensible at sentencing may not be sensible many years later, when the defendant is finally released from prison. (Defendant Siegel was sentenced to 30 years in prison.) And while it's true that conditions of supervised release can be modified at any time, 18 U.S.C. § 3583(e)(2), modification is a bother for the judge, especially

when, as must be common in cases involving very long sentences, modification becomes the responsibility of the sentencing judge's successor because the sentencing judge has retired in the meantime.

A more serious problem with the current system is that, as we'll see when we discuss the conditions imposed in our two cases, a number of the listed conditions, along with a number of conditions that judges modify or invent, are vague.

Another serious problem is the difficulty of predicting recidivism. Reducing recidivism is the main purpose of supervised release, though some of the conditions of supervised release are intended to help the released prisoner adjust to life on the outside even if there is no worry that without them he would be likely to commit crimes; it may be apparent that by the time he's released from prison he will be too old or infirm to resume a life of crime.

There is an extensive social scientific literature on the causes and cures of recidivism. See, e.g., Francis T. Cullen, Cheryl Lero Jonson & Daniel S. Nagin, "Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science," *Prison Journal*, vol. 91, no. 3 supp., Sept. 2011, p. 48S; Cassia Spohn & David Holleran, "The Effect of Imprisonment on Recidivism Rates of Felony Offenders: a Focus on Drug Offenders," 40 *Criminology* 329 (2002); R. Karl Hanson & Monique T. Bussière, "Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies," 66 *J. Consulting & Clinical Psychology* 348 (1998). And the probation service is well aware of this literature. See, e.g., U.S. Courts, "Risk Assessment Tool Helps Probation Officers," www.youtube.com/watch?v=S-nGDKgdTi4; Laura M. Baber & Mark Motivans, "Extending

Our Knowledge About Recidivism of Persons on Federal Supervision," *Federal Probation*, vol. 77, no. 2, Sept. 2013, www.uscourts.gov/uscourts/FederalCourts/PPS/Fedprob/2013-09/knowledge.html.

But there are limitations to the studies as guides to sentencing. There is the difficulty of determining the number of crimes committed by a person after his release from prison—the number that is the real measure of recidivism—as distinct from the number of his arrests or convictions, which may be much smaller. And statistical studies are unlikely to enable a confident prediction that a *particular* inmate will or will not commit crimes after he is released. Moreover, while there is evidence that supervised release and other programs of community supervision do reduce recidivism, perhaps substantially, see D.A. Andrews & James Bonta, "Rehabilitating Criminal Justice Policy and Practice," 16 *Psychology, Public Policy & Law* 39 (2010); Paula Smith, Paul Gendreau & Kristin Swartz, "Validating the Principles of Effective Intervention: A Systematic Review of the Contributions of Meta-Analysis in the Field of Corrections." 4 *Victims & Offenders* 148 (2009), there is controversy over the efficacy of some typical conditions of supervised release.

For example, a condition commonly imposed on a sex offender is forbidding him access to pornography. Suppose he's a rapist, but only of adult women; he has no sexual interest in minors. Denying him access to pornography may make him less likely to commit rape when he's released from prison if (at the time of sentencing) he tests high on measures of sexual aggression, Drew A. Kingston et al., "Pornography Use and Sexual Aggression: The Impact of Frequency and Type of Pornography Use on Recidivism

Among Sexual Offenders," 34 *Aggressive Behavior* 341, 348 (2008); Michael C. Seto et al., "The Role of Pornography in the Etiology of Sexual Aggression," 6 *Aggression & Violent Behavior* 35, 46–48 (2001)—or more likely because pornography can be a lawful substitute source of sexual gratification for a sex crime for which the perpetrator if caught is likely to be severely punished, whereas viewing pornography other than child pornography is not criminal. Milton Diamond, Eva Jozifkova & Petr Weiss, "Pornography and Sex Crimes in the Czech Republic," 40 *Archives of Sexual Behavior* 1037, 1040–42 (2011); Berl Kutchinsky, "The Effect of Easy Availability of Pornography on the Incidence of Sex Crimes: The Danish Experience," 29 *J. Social Issues* 163, 176–78 (1973).

A further problem, though it seems to arise rarely, is that because the conditions of supervised release are imposed at sentencing, the conditions recommended to the judge at the sentencing hearing may be a product of negotiation between prosecution and defense. The defendant's lawyer may offer the prosecution a trade—more supervised release for a reduced prison term—and the prosecutor may accept. And when the adversaries thus agree, the sentencing judge, habituated as American judges are to adversary procedure, may be reluctant to subject the agreed-upon conditions to critical scrutiny. Yet the law is clear that the fact that the prosecution and the defense agree on a sentence does not excuse the judge from having to determine its conformity to the sentencing factors in 18 U.S.C. § 3553(a). *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality); *United States v. Aguilar-Ibarra*, 740 F.3d 587, 591 (11th Cir. 2014) (per curiam); U.S.S.G. § 6B1.2, commentary.

And last is a concern that probation officers spend too much time on enforcement (that is, making sure the released prisoner is complying with all the conditions of supervised release) relative to supervision, James Bonta et al., "Exploring the Black Box of Community Supervision," 47 *J. Offender Rehabilitation* 248 (2008)—a serious concern given the understaffing of the probation service, discussed next.

By default, most judges, in deciding what conditions of supervised release to impose, rely heavily on the recommendations of the federal probation service (formally, the "U.S. Probation and Pretrial Services System"), a unit of the Administrative Office of the U.S. Courts. (For a comprehensive summary of the duties and functions of the probation service, prominently including supervised release, see U.S. Courts, *Guide to Judiciary Policy*, vol. 8: *Probation and Pretrial Services*, part E: "Supervision of Federal Offenders" (2010).)

A probation officer prepares the presentence report that advises the judge on the sentence to give the defendant who has been found guilty. The report (or sometimes a later supplement to it) will, under the heading "Sentencing Recommendation," suggest conditions of supervised release, with usually a brief reason for each one. The brevity of the reasons given may reflect the fact that the probation service, though responsible and knowledgeable, is understaffed. The number of persons under supervision either pre- or post-trial is approaching 200,000. See Matthew G. Rowland, "Too Many Going Back, Not Enough Getting Out? Supervision Violators, Probation Supervision, and Overcrowding in the Federal Bureau of Prisons," *Federal Probation*, vol. 77, no. 2, Sept. 2013, www.uscourts.gov/uscourts/FederalCourts/PPS/

Fedprob/2013-09/too-many.html. Yet there are only about 5,400 probation officers. Dividing the number of persons under supervision by the number of officers yields a ratio of 36 such persons to each officer, which seems too many for effective supervision, especially when we consider that 90,000 federal criminal defendants were sentenced in the year ending on September 30, 2010 (we haven't found more recent statistics), so that the probation service had to write 90,000 presentence reports in addition to performing its other duties. There is some evidence that reducing caseloads can reduce recidivism, at least if the intensity of supervision is not reduced, without increasing the number of revocations of release that are based on technical violations of conditions of release. Sarah Kuck Jalbert et al., "Testing Probation Outcomes in an Evidence-Based Practice Setting: Reduced Caseload Size and Intensive Supervision Effectiveness," 49 *J. Offender Rehabilitation* 233 (2010).

Judges are limited in their ability to look behind the recommendations of the probation officers. The academic studies of recidivism are unfamiliar to most judges and often difficult for a judge who lacks a social-scientific background to evaluate. And it is doubtful that even experienced judges, who have sentenced a great many criminals, acquire from that experience a sophisticated understanding of the likely behavior of convicted criminals upon their release from prison and how that behavior can be altered by imposing post-release restrictions before, often long before, a prisoner's release.

So it is both inevitable and proper that judges give weight to the probation service's recommendations regarding what conditions of supervised release to impose. But

how much weight? Normally the recommendations in the report are those of a single probation officer, and the scientific basis (if there is a scientific basis) of his recommendation is not disclosed in his presentence report. Probation officers receive only limited training in the duties of their job (consisting primarily of six weeks at the Federal Probation and Pretrial Services Training Academy, though there is follow-on training as well). See U.S. Courts, "Probation and Pretrial Services: Officers and Officer Assistants," www.uscou rts.gov/federalcourts/probationpretrialservices/officers.aspx.

Sentencing judges don't always rely entirely on the probation officer's recommendations of conditions of supervised. The conditions the judge decides to impose may be an amalgam of the recommendations in the presentence report, (rarely) the recommendations of the prosecutor and the defense lawyer, and the judge's intuitions. But often judges seem not to look behind the recommendations, as suggested by the fact that in his sentencing statement the judge may recite the conditions of supervised release that he is imposing without giving reasons for why he imposed those particular conditions. Christine S. Scott-Hayward, "Shadow Sentencing: The Imposition of Federal Supervised Release," 18 *Berkeley J. Crim. L.* 180, 187 (2013). Often, indeed, even though as we said earlier 18 U.S.C. § 3553(c) requires the sentencing judge to explain how his sentence (and remember that the conditions of supervised release that he imposes are part of the sentence) comports with the sentencing factors listed in section 3553(a), see *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *United States v. Washington*, 739 F.3d 1080, 1081–82 (7th Cir. 2014), he will merely repeat what is in the Sentencing Recommendation in or attached to the presentence report. He will not explain how the recommendation

comports with the sentencing factors, which is a determination for the judge to make, not the probation service.

One reason for this judicial insouciance is that the sentencing hearing may be the first occasion on which defense counsel learns of the probation service's recommendation for conditions of supervised release. With no advance notice, counsel may have nothing to say about the conditions; nor is he likely to be prodded by his client, because the remoteness of the future time at which the conditions will take effect may very well make them a matter of indifference to the defendant. Criminals who court long prison sentences tend to have what economists call a "high discount rate." That is, they give little weight to future costs and benefits. That is why they are not deterred by the threat of a long prison sentence, since the added cost of the added length of the sentence will not be experienced for many years. Defendants are more likely to be concerned with whether they can self-surrender at a later date to begin serving their prison term rather than being taken directly from the sentencing hearing to prison, and what prison they will be assigned to—determinations that will affect their immediate welfare—than with restrictions that will not take effect for many years. With therefore no adversary challenge to the conditions of supervised release, the judge, being habituated to adversary procedure, is unlikely to question the conditions recommended by the probation service.

Against this background we turn to the conditions of supervised release imposed on our two defendants. We begin with Siegel, convicted along with his wife of ugly sexual offenses against multiple children, including his two-year-old daughter—offenses including both physical sexual abuse of

the child and creation of child pornography—and sentenced to 30 years in prison. The judge ordered that the conditions of supervised release imposed on him remain in force for the rest of his life. Given time served and assuming good behavior in prison, he will be approaching 60 when released, and therefore likely to remain subject to these conditions for many years.

The judge at sentencing read off the conditions that he had decided to impose. He made a few useful clarifying changes in some of the conditions but did not attempt to justify any of the conditions by reference to the statutory sentencing factors. He did say that "in terms of the prohibition against [Siegel's] possessing or having under his control any material, legal or illegal, that contains nudity, I'm satisfied that in his situation that's justified." But that is a conclusion, rather than a reason related to anything in section 3553(a)(2)—and not a very clear conclusion. It was made in response to the prosecutor's argument that the ban on nudity was needed in order to prevent Siegel from downloading child pornography and, if this was discovered, claiming that he'd done so by accident while searching for adult pornography. The argument supported a prohibition against Siegel's having access to any pornography, but not necessarily against his having access to depictions of, let alone purely verbal references to, nudity even when the depictions or references are not pornographic.

The nudity condition was the only one discussed in any depth at the sentencing hearing. The presentence report had recommended the following wording: "You shall neither possess nor have under your control any material, legal or illegal, that contains nudity or *that depicts or alludes to sexual*

*activity or depicts sexually arousing material*" (emphasis added). Siegel's lawyer objected that this would forbid Siegel to read the Bible. He was right; the Bible contains allusions to sexual activity. The judge responded by changing the clause we've italicized to "text narratives concerning the sexual abuse of children, or internet chats exchanging ideas and experiences regarding the sexual abuse of children." He explained that by doing this he was providing "a laundry list of things that are specifically intended to address what [Siegel] did here, what he could reasonably be expected to consider doing in the future, and also the things based on this record that would suggest the things that might act as triggers for him."

The judge said enough to justify a nudity condition of some sort. But of what sort exactly? What about the Bible? It "contains nudity," unless "contains" only means "provides a visual depiction of"—but that would be a forced interpretation. The judge said that his revised nudity condition included "an element of common sense"; "I've been a judge for more than 30 years. To my knowledge, no one has ever been brought in front of this court … because they went to an art museum or read the Bible." No doubt. But that seems a reference to the exercise of discretion by probation officers, rather than a qualification of the "contains nudity" condition itself.

So that key condition remains a muddle, and for the additional reason that the judge did not explain why the condition should not be limited to visual depictions of nudity related or incidental to sexual urges or activities. Is "nudity" meant to include innocuous partial nudity, such as a photograph, in no respect prurient, of an adult wearing a bathing

suit? So not only is "contains" vague, but "nudity" is over-broad, see *United States v. Simons*, 614 F.3d 475, 483–84 (8th Cir. 2010), and we suggest therefore that "contains nudity" be rephrased as "material that depicts nudity in a prurient or sexually arousing manner."

The judge failed to comply with 18 U.S.C. § 3553(a) by not giving reasons for the other conditions that he was imposing, but the error was harmless with regard to a number of them. An example is the prohibition against Siegel's "transmit[ting] any sexually arousing material, including child pornography, via the Internet." The consistency of that condition with the statutory sentencing factors is plain, given the nature of Siegel's crime, though we wonder how such a prohibition will be enforced. The probation service is as we said understaffed, and in some districts relies heavily on the supervisee's periodically phoning his probation officer to tell him that he's complying with all conditions.

Several components of five of the nine conditions are troubling besides the nudity condition. The first is a prohibition of purchase, possession, or use of any "mood altering substances," a term neither defined nor self-evident. It could include coffee, cigarettes, sugar, and chocolate, among many others; yet these substances are not causal factors of recidivist behavior. At oral argument the government's lawyer suggested a much better definition, which would exclude coffee, cigarettes, sugar, and chocolate: "psychoactive substances that impair physical or mental functioning," including street, synthetic, or designer drugs, such as "bath salts" (a synthetic amphetamine-like product) and "potpourri" (also called "spice," a synthetic form of marijuana) some ver-

sions of which, when Siegel was sentenced, had only recently been designated controlled substances.

Conditions eight and nine require the defendant to "participate in a sex offender program as deemed necessary by the probation office," "submit to physiological testing, including polygraph testing, which may be part of a sex offender treatment program as directed by the … [probation] office," and participate in "psychiatric services and/or a program of mental health counseling/treatment as directed by the probation officer and … take any and all prescribed medications as directed by the probation officer." We have grouped these conditions because of their repetitiousness and lack of definition. If physiological testing *may be* rather than must be part of the required sex-offender treatment program, implying that it is not a mandatory part, why is it a free-standing requirement, imposed whether or not it is part of a sex-offender treatment program? What other function could it serve? Is it just a euphemism for giving the prisoner lie-detector tests?

And why are both psychiatric and mental health treatment, which differ mainly in that psychiatrists can prescribe drugs while psychologists generally cannot (and not all mental health counselors are even psychologists), specified as conditions of supervised release? It is unclear whether these are intended to be components of the sex-offender treatment program or separate from it, and if the latter why the defendant is to be subjected to separate psychiatric attention, since a sex-offender treatment program will have a significant psychiatric component. It's true that Siegel has been diagnosed with other psychological disorders besides pedophilia. But the judge did not indicate whether he believes

that those disorders would be likely to cause Siegel to engage in criminal activity when he is released from prison many years from now unless he receives treatment then and perhaps for the rest of his life.

And why is a probation officer, rather than a physician or nurse or pharmacist, entrusted with directing *which* medications the defendant must take? And what is the force of "any and all" prescribed medications? And how can a judge have known on March 20, 2013, when the sentence was imposed, or the probation service, on January 31, 2013, when the presentence report was submitted, what if any psychiatric services the defendant would require when he was eventually released? By that time the medical and criminological understanding of recidivism and methods of minimizing it may have changed completely. But that is not a criticism that can be made of the sentencing judge. It is a flaw in the Sentencing Reform Act, which makes the conditions of supervised release a part of the sentence. One would think that they would be imposed after a court hearing held on the eve of the defendant's release from prison. The hearing would also serve as a reminder to the defendant that he is still under judicial supervision, even though his sentence was imposed a long time ago.

The last three conditions of Siegel's supervised release that trouble us—substance-abuse treatment; installation of filtering software on any computer he uses, in order to block his access to sexually oriented websites; and the sex-offender treatment program, including physiological testing, just mentioned—trouble us for one reason (except that it is a further rather than the sole reason in the case of the sex-offender treatment condition): understood literally they re-

quire the defendant to bear the expense of complying with those conditions, without qualification. Nothing is said about what happens if he can't pay the entire cost. Will his supervised release be revoked because he won't be complying with the conditions in question in their entirety? Or will the government pay for them? It must mean the latter, see 18 U.S.C. § 3672; *United States v. Smith*, No. 12-CR-30087, 2013 WL 1150909, at *5 (C.D. Ill. Mar. 19, 2013), as the judge in our other case (*Norfleet*) made clear in stating that "the requirement of payment is done by Probation taking into account the defendant's ability to pay." Revoking a defendant's supervised release and recommitting him to prison for mere inability to pay would constitute imprisonment for debt. The judge in Siegel's case must make this explicit on remand.

A number of the conditions that we've questioned are not challenged in Siegel's appeal; indeed, the defendant's lawyer had told the judge he had "no objection" to most of them. He may even have proposed them in exchange for a lighter sentence (though, given the length of Siegel's sentence, this is unlikely). But remember that the judge is not required to accept the parties' agreed-upon sentencing recommendations, or even permitted to do so without first complying with his independent duty to determine the reasonableness of every part of a sentence, including the conditions of supervised release. *United States v. Aguilar-Ibarra*, *supra*, 740 F.3d at 591.

We move on to Norfleet, convicted of possession of, with intent to distribute, more than 28 grams of crack cocaine, and sentenced to the statutory minimum of 10 years in prison. 21 U.S.C. §§ 841(b)(1)(B), 851. His conditions of supervised release are to remain in force for 8 years after his re-

lease, the statutory minimum for his offense (see 21 U.S.C. § 842(b)(1)(B)), which means that the actual length of his sentence is 18 years. With time served and maximum good-time credits he'll be 39 when released from prison. The conditions were as recommended in the presentence report, with a few changes, of which the most important changed "You shall refrain from any use of alcohol" to "You shall refrain from the excessive use of alcohol," and changed "[You] shall not purchase [etc.] … any … mood altering substance" to "[You] shall not purchase [etc.] … any … mood altering substance (excluding coffee, tea, and soda)."

Excluding coffee, tea, and soda from the class of mood-altering substances—exclusions missing from Siegel's parallel condition of supervised release—is certainly a step in the right direction. But not a big enough one. Will Norfleet upon his release from prison be permitted to put two teaspoonfuls of sugar in his cup of coffee? A number of familiar foods, including blueberries, are called "mood foods" because they can have significant effects on the eater's mood and maybe even on a psychiatric condition that he might have such as depression. See, e.g., Markham Heid, "Eat This, Feel That: The Mind-Altering Effects of Everyday Foods," *Prevention*, Aug. 2012, www.prevention.com/food/food-remedies/foods-alter-your-mood. Are such foods to be forbidden to Norfleet when he emerges from prison? Obviously not, but as in Siegel's case the formulation offered by the government's lawyer (the same lawyer in both cases), which we quoted earlier, is superior and it or an equivalent should be substituted for "mood altering substance."

The judge did explain that "the reason I'm including the [prohibition against use of] mood-altering substance[s] is be-

cause of the fact that there are many drugs that are not yet scheduled [the reference is to the schedule of controlled substances, see 21 U.S.C. § 812, that is, drugs such as cocaine that are tightly regulated, and often illegal other than in very rare circumstances], and there are available items, such as bath salts and potpourri, which could affect your ability to control yourself." But the phrase she used—"mood-altering substance"—is not limited to the type of drug she listed: drugs that should be deemed controlled substances but hadn't yet been when he was sentenced.

Another oddity concerning the "mood-altering substance" condition is that while purporting to forbid the use of any such substance (unless prescribed by a doctor or other medical officer) except coffee, tea, and soda, it forbids only "excessive" use of alcohol, and thus carves a major exception to the prohibition. And a vague one. For what *is* excessive drinking? Upon his release from prison Norfleet probably will be handed a brochure called an "orientation to supervision" that will include a definition of the term. We can't find the brochure used in the Central District of Illinois, but it seems that other districts (and so probably the Central District as well) define it as "any use of alcohol that adversely affects your employment, your relationships, or your ability to comply with the conditions of supervision. This includes the use of alcohol which results in the violation of any local, state, or federal laws including disorderly intoxication and/or driving under the influence." E.g., U.S. Probation Office, "Orientation to Supervision: Western District of Missouri," p. 13, www.mow.uscourts.gov/probation_pretrial/probation_forms/orientation_complete.pdf.

The second part of the definition—use of alcohol that results in an actual violation of law—is clear, but the first ("adversely affects") is not. The Centers for Disease Control and Prevention define "excessive alcohol use" as alcohol use that "includes binge drinking, heavy drinking, any alcohol use by people under the age 21 minimum legal drinking age, and any alcohol use by pregnant women," and defines "heavy drinking" by men as "consuming 15 drinks or more per week." Centers for Disease Control, "Alcohol and Public Health: Frequently Asked Questions," www.cdc.gov/alcohol/faqs.htm. A defendant can find tables for calculating the percentage of alcohol in his blood from his weight and sex and from the number and size and alcohol content and recency of his drinks. See, e.g., B.R.A.D. (Be Responsible About Drinking), "Estimated BAC Information," www.brad21.org/bac_charts.html; Blood Alcohol Calculator, "BAC Charts," http://bloodalcoholcalculator.org/bac-charts/. These websites are not authoritative, but may be useful supplements to the CDC's definition of excessive alcohol use, which in turn is superior to the definition in the "orientation to supervision" brochure.

A further oddity is that Norfleet is ordered to undergo a program for treatment of substance abuse that includes "not more than six tests per month to determine whether you have used … alcohol." Yet he's *allowed* to consume alcohol. Presumably the purpose of the tests is to see how much he's consumed, but the statement of conditions of supervised release doesn't say that.

Another question is why substance-abuse treatment is deferred until the defendant is released from prison. The program cannot have an instantaneous effect. Days, weeks,

probably months will elapse after the defendant begins the program (upon his release) before its effects are felt. During that period the program may have little or no effect on the likelihood of his committing crimes. But this problem is not within the power of either the probation service or the courts to solve. The Bureau of Prisons does offer a "Residential Drug Abuse Program," but neither the probation service nor the judge can require that a prisoner be allowed to enroll in it. The judge did recommend that Norfleet "serve [his prison sentence] in a facility that will allow [him] to participate in the residential drug abuse program," but that was the most she could do.

Norfleet complains about the judge's ordering him to participate in a "cognitive behavioral therapy" program—"a common type of mental health counseling," Mayo Clinic, "Cognitive Behavioral Therapy," www.mayoclinic.org/tests-procedures/cognitive-behavioral-therapy/basics/definition/prc-20013594—as a condition of his supervised release. That was a proper condition to impose on him, given his history of substance abuse. Cognitive behavioral therapy isn't just for the mentally ill; it "can be an effective tool to help anyone learn how to better manage stressful life situations." *Id.* There is evidence that it can also reduce recidivism. See, e.g., David B. Wilson, Leana Allen Bouffard & Doris L. MacKenzie, "A Quantitative Review of Structured, Group-Oriented, Cognitive-Behavioral Programs for Offenders," 32 *Criminal Justice & Behavior* 172, 198–200 (2005); Nana A. Landenberger & Mark W. Lipsey, "The Positive Effects of Cognitive–Behavioral Programs for Offenders: A Meta-Analysis of Factors Associated with Effective Treatment," 1 *J. Experimental Criminology* 451, 470–71 (2005). The judge should have made clear, however, that Norfleet's participation in the program

would not necessarily have to continue for the full eight years of his supervised release. It should continue only as long as the probation service considers it to be helping to keep Norfleet out of trouble.

In summary, these cases must be remanded for reconsideration of the conditions of supervised release imposed on these defendants that we have raised questions about. And for the future we recommend the following "best practices" to sentencing judges asked to impose (or minded on their own to impose) conditions of supervised release:

1. Require the probation service to communicate its recommendations for conditions of supervised release to defense counsel at least two weeks before the sentencing hearing.

2. Make an *independent* judgment (as required in fact by 18 U.S.C. § 3553(a)) of the appropriateness of the recommended conditions—independent, that is, of agreement between prosecutor and defense counsel (and defendant) on the conditions, or of the failure of defense counsel to object to the conditions recommended by the probation service.

3. Determine appropriateness with reference to the *particular* conduct, character, etc., of the defendant, rather than on the basis of loose generalizations about the defendant's crime and criminal history, and where possible with reference also to the relevant criminological literature.

4. Make sure that each condition imposed is simply worded, bearing in mind that, with rare exceptions, neither the defendant nor the probation officer is a lawyer and that when released from prison the defendant will not have a lawyer to consult.

5. Require that on the eve of his release from prison, the defendant attend a brief hearing before the sentencing judge (or his successor) in order to be reminded of the conditions of supervised release. That would also be a proper occasion for the judge to consider whether to modify one or more of the conditions in light of any changed circumstances brought about by the defendant's experiences in prison.

Before ending this long opinion, we need to discuss an issue raised in Siegel's appeal that is unrelated to supervised release. His wife, the collaborator in his crimes, was sentenced to 24 years in prison—a sentence six years shorter than his. He says she was equally guilty and he should therefore receive no greater sentence. That is a non sequitur. Suppose the two were equally guilty. That could just mean that she should have been sentenced to 30 years. If the judge by mistake gave her too short a sentence, maybe believing that when a husband and wife commit a crime together the husband is *always* the instigator, that's no reason for us to order the judge to make the same mistake with regard to Siegel by reducing his sentence to 24 years. *Kinnard v. United States*, 313 F.3d 933, 934–36 (6th Cir. 2002); *United States v. Contreras*, 108 F.3d 1255, 1272 (10th Cir. 1997). Rather it would have been a reason for the government to appeal her sentence—which it didn't do.

It's not as if the judge had said that he was giving Siegel a longer sentence *because* he's a man. He said that Siegel had done a bad thing that his wife hadn't done: he had complicated the government's investigation by destroying his computer's hard drive, which doubtless contained child pornography. He destroyed it so completely that the government was unable to recover any of the data in it. Was six years too

great a sentence increment for such a destruction of evidence? But that isn't the question. Six years may have been too much, but not because the judge had made a mistake in giving Siegel's wife only a 24-year sentence. One doesn't cure an error by compounding it.

So the prison sentences in both our cases stand, but the cases must be remanded for reconsideration of the conditions of supervised release that we have determined to be inappropriate, inadequately defined, or imposed without the sentencing judge's having justified them by reference to the sentencing factors in 18 U.S.C. § 3553(a).

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.